# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

United States of America,   Crim. No. 10-162 (ADM/SRN)

      Plaintiff,

v.   **REPORT AND RECOMMENDATION**

Theron Preston Washington,

      Defendant.

---

    Leshia M Lee-Dixon, Esq., Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff United States of America.

    Katherian D. Roe, Esq., Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, Minnesota 55415, and Ryan P. Garry, Esq., Ryan Garry, Attorney, LLC, 301 4th Avenue South, Suite 285, Minneapolis, MN 55415.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

    The above-captioned case comes before the undersigned United States Magistrate Judge on Defendant's Pretrial Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 14]; Motion to Suppress Eyewitness Identifications [Doc. No. 15]; and Pretrial Motion to Suppress Identification, Statements, Admissions, and Answers [Doc. No. 16]. This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.[1]

---

[1] The Court has addressed Defendant's non-dispositive motions in a separate Order.

1

## I. BACKGROUND

The Government filed an Indictment against Defendant Theron Preston Washington on June 14, 2010, charging him with one count of bank robbery [Doc. No. 6]. The Indictment alleges Washington robbed the Northeast State Bank located at 200 Coon Rapids Boulevard in Coon Rapids, Minnesota on June 8, 2010.

This Court held pre-trial motions hearings on July 16, 2010 and July 23, 2010. Lieutenant Dan Szykulski, Captain John Hattstrom, Special Agent Tom Perzichilli, Officer Robert Trusler, and Detective Brian Eychaner testified at the hearings on behalf of the Government. The Court received in evidence Government's Exhibit 1, Statement of show-up with Tiffani Sue Schoolmeesters; Government's Exhibit 2, a CD recording of the Interview of Defendant on June 8, 2010; and Government's Exhibit 3, Statement of show-up with Scott David Hudson. This matter is set for trial before United States District Judge Ann D. Montgomery on September 8, 2010.

## II. FACTS

On the morning of June 8, 2010, at approximately 9:25 a.m., officers from the Coon Rapids, Blaine, and Spring Lake Park police departments received a call from dispatch indicating there had been a robbery at Northeast State Bank, located at 200 Coon Rapids Boulevard Northwest, in Coon Rapids. (Transcript of Motion Hearings held on July 16, 2010 and July 23, 2010 at 113, hereinafter "Tr."). There is a Mutual Aid Pact Agreement in Anoka County that authorizes officers from other jurisdictions to assist neighboring jurisdictions with serious incidents. (Id. at 115).

While responding to the call, Detective Brian Eychaner ("Eychaner") heard from dispatch that the robbery suspect was a lone black male wearing a white shirt and possibly jeans. (Id. 113-14). Dispatch also indicated that a demand note had been presented in the robbery. (Id. 114). According to dispatch, an employee of the bank, later identified as vice president Scott Hudson ("Hudson") had seen the robbery suspect leave in a maroon "Airport Taxi" minivan. (Id.). Hudson also provided dispatch with the license plate for the taxi and dispatch contacted Airport Taxi Service to obtain a GPS location for the van. (Id.)

Eychaner arrived at the bank at approximately 9:31 a.m., at the same time as Sergeant Jon Urquhart ("Urquhart"). (Id. at 116). When the officers arrived at the bank, three bank employees were waiting outside, including Hudson. (Id. at 116-17). At that point, Eychaner focused on locating and preserving evidence from the robbery and speaking to witnesses. (Id. at 117). First, Eychaner spoke to Hudson, while Jeanette Lien, office manager of the bank, began pulling up the surveillance video. (Id. at 118, 121). Hudson identified Tiffani Schoolmeesters ("Schoolmeesters") as the teller who had been robbed and showed Eychaner where the robbery had occurred. (Id.). Urquhart cordoned off the area with police tape and the Anoka crime lab was called to process the scene. (Id.) Eychaner asked another officer to interview Rose Hutchins ("Hutchins"), the other teller who witnessed the robbery. (Id. at 121).

Sergeant John Hattstrom ("Hattstrom") also heard the dispatch call about the robbery and arrived at the bank at approximately 9:32 a.m. (Id. at 33). He assisted in securing the bank and evidence. (Id.). Hattstrom also interviewed Hutchins. (Id. at 34-35). She indicated her attention was drawn to the robber because he had stepped too close to the teller counter. (Id. at 44-45). She described the suspect as a black male with dark skin, 5'2" or 5'3" tall, not heavy, with short

3

hair, and wearing a white t-shirt.  (Id. at 44-45).  Hattstrom provided the description to Eychaner.  (Id. at 48).

With Hudson and Schoolmeesters, Eychaner looked at two still images from the surveillance camera and confirmed the time/date stamp was consistent with the time the robbery occurred.  (Id. at 119).  Eychaner asked Schoolmeesters if the man in the images was the person who had robbed the bank and she replied "yes."  (Id.).  There was another man in the bank during the robbery who did not match the description of a black male in a white shirt.  (Id. at 146).  Eychaner testified that he asked Schoolmeesters to look at the images to verify that the man in the photos was indeed the robber.  (Id. at 145-46).

As he was observing the surveillance video, Eychaner relayed a more detailed description of the suspect to dispatch for all officers in the area to hear.  (Id. at 119).  He observed the male to be African American, stockier, shorter, between five foot two and five foot four, with a shaved head, and facial hair that came to a point in the front.  (Id. at 119-20).  The suspect was wearing sunglasses, a white t-shirt, and a distinctive gold ring on this left ring finger.  (Id. at 120).

Officer Robert Trusler ("Trusler"), of the Coon Rapids police department, also responded to the robbery call.  (Id. at 92).  In the initial dispatch call that Trusler heard, the description of the suspect was a black male with a shaved head and facial hair.  (Id. at 93).  Trusler did not recall whether the dispatch mentioned the height of the suspect.  (Id.).

After the taxi was identified, an officer from Spring Lake Park radioed that he had located a van with that plate number in the area of County Road 10 and Highway 65.  (Id. at 94).  The officer, in plain clothes, approached the cab and "yelled" at the driver to get out of the vehicle.  (Id. at 95).  The driver, Ali Hashi Macalin ("Macalin") did not comply and instead

4

continued driving, despite being pursued by five police cars. (Id. at 95, 103). Ultimately, a Blaine squad car stopped the taxi by pulling in front of the vehicle and blocking its path. (Id.). Officers tried to pull Macalin from the vehicle because they believed the robbery suspect might still be in the taxi. (Id. at 104). After being pulled from his vehicle, Macalin was forced to the ground facedown. (Id. at 105). He was then interviewed by Detective Darren Keasling ("Keasling"). (Id. at 95). Macalin is Somali and had difficulty understanding and communicating with the officers in English. (Id. at 105). Keasling later drove Macalin to the Northtown Mall. (Id. at 95-96, 106). The cab driver confirmed that he had dropped his fare off at door number five at the mall. (Id. at 96). At some point in time, Trusler heard on the radio that other officers viewed video footage at the mall's security office and said a male entered the mall through door five at that time wearing a dark blue or black jacket or shirt and carrying a backpack. (Id. at 96).

Lieutenant Daniel Szykulski, ("Szykulski") also responded to the robbery call. (Id. at 6). Szykulski testified that, in addition to the dispatch descriptions of a shorter black male wearing a white t-shirt, he heard discussion on the radio that the suspect was wearing a black hoodie. (Id. at 6, 16-17). At some point, he also heard on the radio "discussion or information about some change of clothes" and that the suspect had a white t-shirt hanging out under the hoodie. (Id. at 12). At approximately 10:20 a.m., Szykulski responded to an area near the Northtown mall where a perimeter was being set up. (Id. at 6-7). In his unmarked car, Szykulski drove to an area just north of the perimeter on County Road 10, which was approximately one half mile from the bank. (Id.). As Szykulski approached the Taco Bell on County Road 10, he saw a shorter black male wearing a black hoodie. (Id. at 8). Because the individual's hood was up, Szykulski could

5

not see if the suspect had hair or was bald. (Id. at 21). The suspect was not wearing sunglasses and Szykulski did not notice if the suspect had on a gold ring. (Id.).

Deciding to take a closer look, Szykulski drove into the Taco Bell parking lot and past Defendant Washington. (Id. at 9). At that point, Szykulski noticed the individual was carrying a light blue satchel. (Id.). Szykulski then called dispatch and asked if the robbery suspect was carrying a light blue satchel, and dispatch confirmed that he was. (Id.). Szykulski told dispatch he believed he had located the suspect. (Id.).

So that he could keep visual contact with Defendant Washington, Szykulski turned around in the parking lot of another business and waited for another officer to respond to the scene. (Id. at 10). He and an officer from Spring Lake Park approached Defendant Washington, drew their guns, and ordered Defendant Washington to the ground. (Id. at 10, 23-24). The defendant was then immediately handcuffed and Szykulski searched the defendant's waist area. (Id. at 10). Szykulski asked Defendant Washington if he had any weapons or something that could poke or harm the officers, and Washington replied no. (Id. at 10). Szykulski felt a large wad in Defendant Washington's right front pants pocket. (Id. at 11). He removed the item and determined it was a wad of bills. (Id.). In the left front pants pocket, the officer found a white t-shirt. (Id.). Szykulski agreed that he conducted a full search of the defendant, not simply a pat-down search. (Id. at 26).

Defendant Washington was walking "normally" when he was arrested, not running or fleeing. (Id. at 19-20). He was not acting suspiciously and he was cooperative with the officers during the arrest. (Id. at 20, 26). At the time of the arrest, Szykulski knew that other officers had detained or arrested another black male suspect at a nearby Cub Foods. (Id. at 30).

6

After Defendant Washington was arrested, Trusler drove Macalin to the area of the arrest. (Id. at 97). Macalin was in the rear passenger seat of the squad car on the right hand side. (Id. at 98). While en route, Trusler told Macalin "they may have a possible suspect and I need to bring you over there to see if that's him." (Id. at 97). There is no evidence in the record that Trusler gave any instructions to Macalin that, although the person he would see was in custody or handcuffed, he should not assume that was the person who had ridden in the cab. Nor did Trusler ask Macalin for a description of the person who had ridden in his cab before doing the show-up. (Id. at 106). Nor did Trusler ask Macalin how long he had been able to observe that person before dropping him off at the Northtown mall. (Id. at 106-07).

Trusler drove his car towards the area where the suspect had been arrested. (Id. at 98). Many officers were at the scene and Defendant Washington was handcuffed and "surrounded" by officers. (Id. at 98-99). Defendant Washington was facing the road and approximately 40 to 50 feet from the squad car. (Id. at 99-100). As Trusler drove past the defendant, he asked Macalin if he recognized anyone or if anyone looked familiar. (Id. at 100, 109). Macalin said "that's him" and then "pleaded with [Trusler] to continue to drive" because he did not want the defendant to see him. (Id. at 100). Trusler testified that Macalin was "very nervous" and upset. (Id. at 100). Trusler then returned Macalin to his vehicle and took photos of the taxi. (Id. at 101). After leaving the show-up, Macalin stated "All I was doing was sitting at home watching TV. I have kids to feed." (Id. at 102).

At the bank, Eychaner took statements from Hudson and Schoolmeesters. (Id. at 121-22). In the interview, Schoolmeesters indicated the robbery suspect had been in the bank two weeks earlier, possibly casing the bank. (Id. at 122). Employees provided the detective with a

photo of the individual that was in the bank on May 26th, 2010. (Id.). Eychaner testified, however, that the picture was unclear. (Id.). While Eychaner was finishing his interview with Hudson, Darren Keasling, Eychaner's partner, called and informed him that there was a person in custody who had been arrested by the Blaine police department. (Id. at 123). Eychaner asked Keasling to bring the individual to the bank. (Id.).

Eychaner arranged for a show-up with Hudson and instructed Hattstrom to conduct a show-up with Schoolmeesters in another room. (Id. at 124-25). Eychaner and Hudson stood in an office cubicle facing out the south windows of the bank, looking at the parking lot. (Id. at 126). Schoolmeesters and Hattstrom were in a closed office 25-35 feet away, also looking out the south windows at the parking lot. (Id.). Prior to the show-up, Eychaner told Hudson that officers were bringing an individual for him to look at, but that he should not assume that the individual was the person involved in the robbery, even if the person arrived in a police car or was handcuffed. (Id. at 127; Gov. Ex. 3). Hudson stated that he believed he would be able to identify the robber if he saw him again. (Id. at 149). Eychaner also instructed Hudson not to speak to Schoolmeesters about whether he recognized the individual in the show-up. (Tr. at 131; Gov. Ex. 3). Hattstrom told Schoolmeesters that the person she would be shown might not be the suspect from the robbery. (Id. at 36-37; Gov. Ex. 1). He further instructed her that just because the person was being brought in a squad car did not mean the individual was the robbery suspect. (Id.).

A minute or two later, a marked squad car pulled into the parking lot of the bank, followed by an unmarked car that Eychaner recognized as Keasling's vehicle. (Tr. at 127-28). Washington was handcuffed and accompanied by a uniformed officer. (Id. at 51, 148). When

Defendant Washington exited the squad car, he was not in Hudson's line of vision. (Id. at 128). Therefore, Eychaner called Keasling and had him walk the suspect to the west, so Hudson would be able to see them. (Id. at 128, 148). The suspect was approximately 30-40 feet away from the witnesses during the show-up and their view was clear. (Id. at 38, 128). Although it was raining that day, both Hattstrom and Eychaner testified that the rain did not impair their ability to see the suspect. (Id. at 39, 128-29).

After the suspect walked past the south facing windows, Hudson stated "looks like he's [sic] got a jacket on now but I would say that's our guy." (Gov. Ex. 3). Eychaner did not ask any follow up questions to confirm Hudson's certainty. (Tr. at 150).

During the robbery, Schoolmeesters was approximately three or four feet away from the suspect. (Id. at 52). Schoolmeesters was able to clearly see the male in the show-up. (Gov. Ex. 1). Hattstrom asked her, "[i]s that the male involved in the robbery?" (Id.). Schoolmeesters responded "He looks iden . . . almost identical. I just . . . can I get . . . can I look at the camera to see the pants that he was wearing?" (Id.) Hattstrom said no and that the suspect might be wearing different clothing. (Id.). Schoolmeesters then continued, "[o]bviously he did put a different sweatshirt on. His face looked the exact same. The beard, the mustache . . . " (Id.). Hattstrom then asked her how certain she was about the identification and she responded "95% sure it was him." (Id.).

At approximately 11:44, Eychaner and FBI Special Agent Thomas Perzichilli interviewed Defendant Washington at the Coon Rapids police department. (Id. at 132). Eychaner started a visual and audio recording, and then had officers bring Defendant Washington to the interview room. (Id. at 133). After meeting Defendant Washington in the

9

hall, Eychaner introduced himself and Agent Perzichilli. Tr. at 134; Gov. Ex. 2). Eychaner then read Defendant Washington his <u>Miranda</u> warnings from a preprinted card. (<u>Id.</u> at 136; Gov. Ex. 2). Eychaner asked the defendant if he understood each of the rights, and Defendant Washington replied "yes." He did not appear nervous and stated he was not under the influence of any drugs or alcohol. (<u>Id.</u> at 61, 137). In fact, at times the defendant appeared "jovial" and laughed during the interview. (<u>Id.</u> at 139-40). The defendant never asked for a lawyer or to stop the interview. (<u>Id</u>. at 137). During the interview, both officers had weapons and Eychaner's gun was on a hip holster visible to Defendant Washington. (Tr. 60, 134). The officers never took their guns out of their holsters. (<u>Id.</u> at 60).

Eychaner noted that, at the interview, Defendant Washington was wearing a sports jersey, not the white t-shirt he had seen the suspect wearing on the bank surveillance video. (<u>Id.</u> at 137-38). During the interview, Defendant Washington said he had changed clothes in the taxi and discarded some of his clothes and the sunglasses in a garbage can at the mall. (<u>Id.</u> at 138). In total, the interview lasted approximately 45 minutes. (<u>Id.</u> at 63).

### III. **DISCUSSION**

Defendant Washington contends that he was arrested in violation of the Fourth Amendment because officers did not have sufficient probable cause, that the three show-up identifications were unreliable and unduly suggestive, and that his custodial statements were tainted by his illegal arrest.

### A. Motion to Suppress Evidence

Contending that his arrest was unconstitutional under the Fourth Amendment, Defendant Washington argues that the evidence uncovered in the search incident to his arrest should be suppressed. This Court disagrees.

The Fourth Amendment guarantees "[t]he rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The parties do not dispute that Defendant Washington's detention was an arrest and not merely a Terry stop. "Probable cause to make a warrantless arrest exists when, considering all the circumstances, police have trustworthy information that would lead a prudent person to believe that the suspect has committed or is committing a crime." United States v. Parish, 606 F.3d 480, 486 (8th Cir. 2010) (quoting United States v. Velazquez-Rivera, 366 F.3d 661, 664 (8th Cir. 2004)); see also Devenpeck v. Alford, 543 U.S. 146, 152, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004). In determining whether officers had probable cause for an arrest, the court examines the events leading up to the arrest and decides whether the "historical facts, viewed from the standpoint of an objectively reasonable police officer," constitute probable cause. Maryland v. Pringle, 540 U.S. 366, 371, 124 S. Ct. 795, 800, 157 L. Ed. 2d 769 (2003). "A probability or substantial chance of criminal activity, rather than an actual showing of criminal activity" is sufficient. United States v. Torres-Lona, 491 F.3d 750, 756 (8th Cir. 2007). In evaluating whether there was probable cause, the court considers the collective information known to all the law enforcement officers. Baribeau v. City of Minneapolis, 596 F.3d 465, 489 (8th Cir. 2010) (citing White v. United States, 448 F.2d 250, 254 (8th Cir. 1971)).

The facts of this case are similar to the facts in United States v. Jones, 535 F.3d 886 (8th Cir. 2008). As in this case, immediately after the robbery in Jones, a teller provided a detailed description of the suspect, including his height, race, clothing, and physical build. Id. at 890. The description of his clothing and attire was later updated after security personnel saw the suspect. Id. The officers also knew the suspect was carrying a backpack and a soft drink bottle and the defendant was carrying those items at the time of his arrest. Id. Like this case, the officer knew the general area where the suspect had fled. Id. Finally, the defendant was arrested less than a mile from the bank and within thirty minutes of the robbery. Id.; see also United States v. Oakley, 153 F.3d 696, 697-98 (8th Cir. 1998) (officers had "more than sufficient" probable cause when defendant was arrested within an hour of the robbery, within 12 blocks of the crime, and matched the physical description of the suspect, matched an updated clothing description, and was carrying a backpack within which an individual had seen the suspect place clothes and a handgun).

Defendant cites a number of cases which hold that an arrest based only on a vague description of a suspect is not supported by probable cause. Defendant is correct that, where officers receive only a vague description of a suspect and many people could fit that description, officers do not have probable cause for an arrest. United States v. Shavers, 524 F.2d 1094, 1095-96 (8th Cir. 1975). However, where a person meets the description of a suspect, and other information links that suspect to a crime, there may be sufficient facts to support probable cause. United States v. Martin, 28 F.3d 742, 745 (8th Cir.1994) cited in United States v. Van, No. 07-102, 2007 WL 2159497, *8 (D. Minn. July 25, 2007). In Martin, the court concluded there was probable cause when the officers had a description of the suspect's height, weight, race, and hair

color, they knew that the defendant's van was seen idling near the crime scene, and the defendant's wife told police that he had been in exclusive possession of the van for three weeks. Martin, 28 F.3d at 745. The court held that, although the fact that the defendant fit a general description would not alone support probable cause, when combined with other information suggesting the defendant had committed the crime, there was probable cause for the arrest. Id.

In contrast, the cases cited by Defendant are distinguishable. In Shavers, which also involved a bank robbery, the arrest of the defendant was based on a broadcast description of the suspect as a black male who was 5'8" tall, who was a block from the crime scene ten minutes after it occurred, who was walking fast, and whose pants were wet and had grass on them. Shavers, 524 F.2d at 1095-96. The Eighth Circuit found that an arrest based on this description alone was not supported by probable cause. Id. The court noted that the description of a 5'8" black male described a great number of men in the area, especially given that the community was approximately 50% African-American. Id.

In Gatlin v. United States, 326 F.2d 666, 670-671 (D.C. Cir. 1963), law enforcement officers learned that three black males had robbed a restaurant, that the suspects were "about six feet tall, weighing 150-170 pounds," and that at least one suspect was wearing a light trench coat. Id. at 670 n. 7. Approximately 45 minutes later, a taxi driver was located who stated that a suspicious-acting person had fled from his cab. Id. It is not clear from the testimony or the court's opinion whether the cab driver had picked up the suspicious person at the scene of the robbery. Id. at n. 7. Officers then went to the area where the suspect fled the cab and searched for almost an hour without finding the suspect. Id. at 671. On returning to his car, the arresting officer's partner said a man had just left the general area of the search and was walking down the

highway. Id. The officers located the individual on the highway and arrested him, one and a half miles from the robbery. Id. The court held that the arrest of the individual found on the highway was not supported by probable cause. Id. The court concluded that the arrest was based only on a general description of the robbery suspect as a black male wearing a trench coat, a report that a black male had fled a taxi, and the fact the defendant, a black male, was observed walking down the highway a mile and a half from the scene of the robbery wearing a trench coat. Id. The court did not discuss whether the defendant matched the height and weight description of the suspects.

The Court finds that these cases are distinguishable because the officers here arrested Defendant Washington on more than a vague description. The initial description of the suspect was supplemented on several occasions, including a description taken from the bank's surveillance video and the mall's surveillance video. The officers knew that the suspect was: (1) a black male; (2) shorter in stature (5'2" to 5'4"); (3) with a stocky build; (4) that he was bald; (5) that he had facial hair; (6) that he was dropped off at door number five at the Northtown mall; (7) that he was originally wearing a white t-shirt and jeans; (8) that he was wearing sunglasses and a gold ring on his left hand ring finger; and (9) that he was carrying a blue satchel/backpack. Unlike Gatlin, Macalin picked up the suspect at the bank and Hudson was able to provide the taxi's description and license plate. Macalin confirmed that he dropped off the suspect at the mall at door number five, and the suspect was then viewed on the mall's video surveillance, which showed the suspect was wearing a dark blue or black jacket or shirt and carrying a backpack. Szykulski even contacted dispatch to verify that the suspect had a blue satchel before arresting Defendant Washington. Moreover, Defendant Washington was arrested approximately

14

one hour after the robbery, unlike the defendant in Gatlin who was arrested hours after the crime. Finally, Defendant Washington was arrested only one quarter mile from the mall where the taxi driver left him. (Tr. at 97).

The collective facts known to law enforcement at the time of Defendant Washington's arrest were sufficient to establish probable cause that he was the individual who had committed the robbery. Therefore, the arrest did not violate the Fourth Amendment. Because the officers had probable cause for the arrest, they were entitled to search Defendant Washington incident to the arrest. United States v. Jones, 479 F.3d 975, 978 (8th Cir. 2007) (citing United States v. Hrasky, 453 F.3d 1099, 1100-01 (8th Cir. 200)); see also Chimel v. California, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969); United States v. Robinson, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973). This Court recommends therefore, that the motion to suppress be denied.

### B. Motion to Suppress Eyewitness Identifications

Defendant contends that the three show-ups in this case, with Macalin, Hudson and Schoolmeesters, violated his due process rights. The Court finds that the show-up with Macalin lacked any reliability and was unduly suggestive and therefore recommends that it be suppressed. However, the Court finds that the show-ups with Hudson and Schoolmeesters were sufficiently reliable and recommends that they not be suppressed.

An identification of a defendant by a witness is admissible unless it is *both* impermissibly suggestive and unreliable. United States v. Pickar, No. 09-2361, -- F.3d --, 2010 WL 3168629, *5 (8th Cir. August 12, 2010); Jones, 535 F.3d at 891. "Absent special elements of unfairness, prompt on-the-scene confrontations do not entail due process violations." United States v. King, 148 F.3d 968, 970 (8th Cir. 1998) cited in Pickar, 2010 WL 3168629 at *5. "Police officers need

15

not limit themselves to station house line-ups when an opportunity for a quick, on-the-scene identification arises. Such identifications are essential to free innocent suspects and to inform the police if further investigation is necessary." United States v. Martinez, 462 F.3d 903, 910 (8th Cir. 2006) (quoting King, 148 F.3d at 970).

"An identification is unreliable if its circumstances create a very substantial likelihood of irreparable misidentification." Jones, 535 F.3d at 891. In considering the reliability of an identification, courts consider the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation." Id. (citing United States v. Williams, 340 F.3d 563, 567 (8th Cir. 2003); Neil v. Biggers, 409 U.S. 188, 198, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

In Pickar, the court found that the show-up identification was not unduly suggestive in circumstances similar to the show-ups with Hudson and Schoolmeesters. Pickar, 2010 WL 3168629 at *5; see also Martinez, 462 F.3d at 910. The handcuffed defendant stood between a uniformed officer and a plain clothes officer in front of a squad car. Id. The defendant was in the bank's parking lot, twenty to thirty feet from the witness, who watched the defendant through the bank's windows. Id. The court noted that, "[n]ecessary incidents of on-the-scene identifications, such as the suspect[ ] being handcuffed and in police custody, do not render the identification procedure impermissibly suggestive." Id. (quoting Martinez, 462 F.3d at 910).

### 1. Macalin

Macalin picked the suspect up from the robbery and then drove him to the Northtown mall. Later, five police cars stopped Macalin's taxi. Officers physically tried to remove Macalin

16

from the vehicle and immediately placed him face down on the ground. When he was later taken to the scene of the arrest for the show-up, he was extremely nervous. Unlike the later show-ups at the bank, at the show-up with Macalin, Defendant Washington was "surrounded" by many officers. Macalin was Somali and had communication difficulties speaking and understanding English. Officers did not instruct Macalin that the person he would see might not be the suspect, even if he was in handcuffs and accompanied by police officers. Although, upon seeing the defendant, Macalin stated "that's him" he immediately pleaded with Officer Trusler to continue to drive for fear the defendant would see him. Unlike the show-ups at the bank, the identification procedure with Macalin was not recorded.

Under the totality of the circumstances and based on the factors outlined in <u>Biggers</u>, the show-up with Macalin was unduly suggestive and unreliable. The overwhelming number of law enforcement officers surrounding defendant Washington made the show-up with Macalin more suggestive than the show-ups witnessed by Hudson and Schoolmeesters. Under the first <u>Biggers</u> factor, it is not clear in the record what opportunity Macalin had to view the suspect. There is no evidence in the record on this point, which weighs against the reliability of his identification of defendant. As to the second factor, there is no evidence in the record that Macalin gave a prior description of the person who rode in his cab before the show-up took place. With respect to the third factor, while Macalin ultimately stated "that's him," suggesting some level of certainty in his identification, other factors weigh against the reliability of this identification, including Macalin's emotional state and his inability to understand and speak English. The time between when Macalin witnessed the defendant and the show-up procedure, the last <u>Biggers</u> factor, was admittedly minimal, but the other factors suggesting the show-up was unreliable outweigh this

17

final factor. Under the totality of the circumstances, the Biggers factors underscore the fact that the show-up with Macalin was not reliable and therefore, the Court recommends that the motion to suppress the identification by Macalin be granted.

### 2. Hudson and Schoolmeesters

The identifications by Hudson and Schoolmeesters were sufficiently reliable so this Court recommends that the motion to suppress their identifications be denied. As set forth above, the identification procedures used by officers with Hudson and Schoolmeesters were substantially similar to the procedure in Pickar. Hudson and Schoolmeesters were instructed that, even though the person they were viewing might be handcuffed and accompanied by officers, he might not be the suspect. The first Biggers factor, the witness' opportunity to view the criminal at the time of the crime, supports the reliability of Hudson and Schoolmeesters' identifications. As the teller who was handed the demand note, Schoolmeesters clearly had an opportunity to view the defendant and Hudson stated he would be able to identify the robber if he saw him again. There is no evidence in the record that Hudson or Schoolmeesters provided the officers with a description of the suspect before the show-up procedure, which weighs against reliability under the Biggers factors. However, Schoolmeesters did identify the robber on the bank surveillance video prior to the show-up. The certainty of Hudson and Schoolmeesters' identifications also demonstrates the reliability of the identifications. Hudson clearly stated "I would say that's our guy." While Schoolmeesters noted she was only 95% certain of her identification, she only questioned whether Defendant Washington was wearing different pants than the person who had committed the robbery. She further stated that Defendant Washington looked "identical" to the robber and "his face looked the exact same." The final Biggers factor also suggests the

18

identifications were reliable because the period of time between the crime and the identification was relatively short-a little more than an hour after the robbery. Under the factors set forth in Biggers, the show-ups with Hudson and Schoolmeesters were reliable.

Although citing no law for the proposition, Defendant argues that allowing Hudson and Schoolmeesters to view the surveillance video before the show-up tainted the identification procedure. However, the witnesses viewed the surveillance photos merely to confirm to officers which of the two men in the bank had committed the robbery. Further, when Schoolmeesters asked to view the video again during the identification procedure, the officer refused. The mere fact that Hudson and Schoolmeesters saw photos from the surveillance video does not make the identification suggestive. To the extent the motion seeks to suppress the identifications by Hudson and Schoolmeesters, the Court recommends that the motion be denied.

### C. Motion to Suppress Statements

Finally, Defendant Washington argues that his statements at the Coon Rapids police department should be suppressed because they are "fruit of the poisonous tree" from his unconstitutional arrest. As set forth above, the Court concludes that the arrest was based on probable cause and did not violate the Fourth Amendment. Therefore, the statements are not tainted by the arrest and need not be suppressed.

### IV. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

> 1. Defendant's Pretrial Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 14] be **DENIED**;

2. Defendant's Motion to Suppress Eyewitness Identifications [Doc. No. 15] be **GRANTED in part** and **DENIED in part**:

   a. To the extent the motion seeks suppression of the identification by Macalin, the motion should be **GRANTED**;

   b. To the extent the motion seeks suppression of the identification by Hudson and Schoolmeesters, the motion should be **DENIED**; and

3. Defendant's Pretrial Motion to Suppress Identification, Statements, Admissions, and Answers [Doc. No. 16] be **DENIED**.

Dated: August 24, 2010
s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **September 8, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.